IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MONICA Z. ANDERTON, et. al,

        Plaintiffs,

                                   CIVIL ACTION NO.
                                   1:10-CV-1775-JEC

v.

PAUL T. BENNETT, et. al.,

        Defendants.

## ORDER AND OPINION

This case is before the Court on a Motion to Intervene, Stay Proceedings, and Extend Time for Filing a Pleading in Intervention [30] filed by the Federal Deposit Insurance Corporation as Receiver ("FDIC-R") of Silverton Bank, N.A.  For the reasons discussed herein, the Court **GRANTS** the FDIC-R's Motion to Intervene [30].

## BACKGROUND

Silverton Bank, N.A. ("the Bank") was chartered as a banker's bank in Georgia in 1986,[1] which meant that it served community banks,

---

[1] The Bank was originally named Georgia Bankers Bank and then changed its name in 1994 to The Bankers Bank.  (Compl. [1], Exh. A at Exh. A (Audit Report of the Office of Inspector General), p. 31.)  Effective January 1, 2008, the Bank became known as Silverton Bank, N.A.  (*Id.*)

as opposed to the general public. (Compl. [1], Exh. A at ¶ 47.)
Silverton Financial Services, Inc. ("the Holding Company" or "SFSI")
was the Bank's holding company and sole stockholder. (*Id.* at ¶ 5.)
The Bank and the Holding Company each had a Board of Directors, but
the same individuals served on both boards. (*Id.* at ¶ 22.)
Commercial real estate loans fueled the Bank's growth, enabling the
Bank to expand in 2007 to a national commercial bank. (*Id.* at ¶¶ 47-
48.) By 2009, the Bank's client base included more than 1500 banks
nationwide. (*Id.* at ¶ 1.)

   Nevertheless, the Bank's financial condition deteriorated to the
point that, on May 1, 2009, federal regulators seized the Bank and
appointed the FDIC-R as the Bank's Receiver. (*Id.*) This was the
largest bank failure in Georgia history. (*Id.*) The Holding Company
filed for bankruptcy shortly thereafter, on June 5, 2009. (FDIC-R's
Mem. in Support of its Motion to Intervene ("FDIC-R's Mem.") [30-1]
at p. 4.)

   The eight plaintiffs are former senior vice presidents or vice
presidents of the Bank. (Compl. [1], Exh. A at ¶¶ 13-20.) They
claim to have been vested participants in two plans: the Deferred
Compensation Plan ("Deferred Plan" or "DCP") and the Long Term
Incentive Plan ("Incentive Plan" or "LTIP").[2] (*Id.*) According to the

   _____

   [2] There is some discrepancy in the complaint as to whether all
the plaintiffs participated in the Incentive Plan. The complaint

complaint, "SFSI and Silverton Bank provided the DCP [Deferred Plan] and LTIP [Incentive Plan] to Plaintiffs as partial consideration for their continued, loyal and productive employment at the bank." (*Id.* at ¶ 5.) The complaint states that the Deferred Plan and the Incentive Plan were "created, overseen and controlled by the affirmative actions of the Director Defendants of the Holding Company and Silverton Bank." (*Id.* at ¶ 22.) Plaintiffs define the "Director Defendants" as the Holding Company's Board of Directors, but they note that the Holding Company and Silverton Bank's boards of directors "were comprised of the same persons, and acted interchangeably and without formal distinction." (*Id.*)

The Deferred Plan was available to "a select group of management or highly compensated employees" of a Plan Sponsor. (*Id.* at ¶ 54; Deferred Compensation Plan ("DCP") [43-4] at § 1.13.) The Plan Sponsors included the Bank, whose Board of Directors adopted the Deferred Plan in December 2005, and the Holding Company (the Primary Sponsor). (DCP [43-4] at § 1.19; FDIC-R's Br. in Reply to the Pls.' Br. in Opp. to the FDIC-R's Mot. to Intervene ("FDIC-R's Reply Br. to Pls.' Br.") [44-1] at Exhs. 1-2.) Under the Deferred Plan,

_____

states that Ronald Turbayne is a vested participant in the Deferred Plan, but omits mention of his participation in the Incentive Plan. (Compl. [1], Exh. A at ¶ 20.) Nevertheless, the complaint subsequently asserts that "[e]ach Plaintiff was a vested participant in the LTIP." (*Id.* at ¶ 62.)

eligible employees could voluntarily defer up to 50% of their annual compensation and up to 100% of their annual bonus, less applicable withholdings.  (DCP [43-4] at § 3.1(a)(b).)  In addition, a Plan Sponsor could make discretionary contributions to a participant's account.  (*Id.* at § 3.2.)

Contributions and earnings from the Deferred Plan were held in a grantor trust established between the Holding Company and the Reliance Trust Company.  (DCP Original Grantor Trust ("DCP Trust") [43-4] at § 1(d).)  The Bank adopted the trust agreement and thus became a Grantor under the trust.  (*Id.* at p. 1; FDIC-R's Reply Br. to Pls.' Br. [44-1] at Exh. 6.)  According to the trust agreement, the Deferred Plan participants held only "unsecured contractual rights" against the Grantor, and trust assets were "subject to the claims of that Grantor's general creditors under federal and state law in the event of Insolvency."  (DCP Trust [43-4] at § 1(d).)  In other words, "Plaintiffs' investments in the DCP were subject to the claims of the general creditors of SFSI and Silverton Bank."  (Compl. [1], Exh. A at ¶ 22.)

Plaintiffs describe the Incentive Plan as a "phantom stock plan" that was "designed to provide incentive payments to certain bank employees and which was indexed to the purported market value of SFSI's common stock."  (*Id.* at ¶ 5.)  Participants in the Incentive Plan received awards of "Performance Units" based on the Holding

4

Company's earnings for a fiscal year. (*Id.* at ¶ 62; Re-Stated LTIP Plan ("LTIP") [43-5] at Art. I, p. 6 (definition of "Unit Value").) Like the Deferred Plan, the Incentive Plan relegated the participants' rights to those of general unsecured creditors of the Holding Company and the Bank. (Compl. [1], Exh. A at ¶ 25.) Specifically, the Incentive Plan provided as follows:

> Any and all of the assets of the Corporation [the Holding Company] and each Subsidiary [the Bank] shall be, and remain, the general unpledged, unrestricted assets of the respective entity, which shall be subject to the claims of that entity's general creditors. Each entity's obligation under the Plan shall be merely that of an unfunded and unsecured promise of the entity to pay money in the future, and the rights of the Participants and beneficiaries shall be no greater than those of unsecured general creditors.

(LTIP [43-5] at § 5.6.)

On April 30, 2010, the plaintiffs filed suit in the Superior Court of Fulton County against sixteen Director Defendants, "individually and as officers and directors of Silverton Bank, N.A. and/or Silverton Financial Services, Inc.." (Compl. [1], Exh. A at 1 and ¶¶ 27-43.) Plaintiffs also sued Porter Keadle Moore, the accounting firm for the Holding Company and the Bank, as well as Salvatore A. Inserra, the lead accountant (collectively, "the Accountants" or "PKM"). (*Id.* at ¶¶ 44-46.)

The complaint begins by blaming the Bank's failure on the actions of the Director Defendants and the auditors:

5

> Silverton Bank's failure was not the inevitable product of
> the national economic recession that began in 2008.
> Instead, Silverton Bank's failure was proximately caused
> by the refusal of the bank's Board of Directors to conform
> its conduct to norms imposed by federal regulators and
> standard banking practices, to prepare financial statements
> in accordance with generally accepted accounting
> principles, and the failure of the bank's auditors to
> perform their professional function in accordance with
> generally accepted auditing standards.

(*Id.* at ¶ 2.)   Plaintiffs further blame the loss of their Deferred

Plan and Incentive Plan benefits on the Bank's failure:

> As of May 1, 2009, Plaintiffs were owed hundreds of
> thousands of dollars of invested DCP benefits, for which
> they have not been paid.  As a result of Silverton Bank's
> bankruptcy, proximately caused by the Director Defendants
> and PKM [the Accountants], these benefits have been lost.
>
> . . .
>
> As of May 1, 2009, Plaintiffs were owed hundreds of
> thousands of dollars in invested LTIP benefits, for which
> they have not been paid.  As a result of Silverton Bank's
> bankruptcy, [proximately caused by the Director Defendants
> and the Accountants,] these benefits have been lost.

(*Id.* at ¶¶ 61, 66.)  The complaint then details at great length the

putative reasons for the Bank's downfall, all of which relate to the

actions of the Director Defendants and the Accountants. (*Id.*

at ¶¶ 76-205.)

     The four causes of action against the Director Defendants allege

breaches of fiduciary duties under either federal or state common

law. Counts One through Three allege that the Director Defendants are

personally liable for the losses to the Deferred Plan caused by their

AO 72A
(Rev.8/82)

breaches of fiduciary duties under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3). (*Id.* at ¶¶ 254, 264, 282-83.)   Broadly stated, the plaintiffs claim that the Director Defendants violated their duty to protect the plaintiffs' interests in the Deferred Plan by "standing idly by [while] the Bank spiraled [into] insolvency," despite their knowledge that the Deferred Plan's assets were subject to the Bank's general creditors and that the Bank was being seriously mismanaged and engaging in unlawful activity. (*Id.* at ¶ 262.)   Count Four acknowledges that the Incentive Plan is not an ERISA plan, but alleges that the Director Defendants breached their fiduciary duties under Georgia common law to protect the plaintiffs' vested interests in the Incentive Plan and to disclose all material facts related to the Bank's financial condition. (*Id.* at ¶¶ 284-86.)

The case was removed to this Court on June 9, 2010.   The Outside Directors[3] subsequently filed a Motion to Dismiss [3], as did defendant Tom A. Bryan.[4]   ([8].)

---

[3] The Outside Directors consist of defendants Paul T. Bennett, Michael Carlton, W. Roger Crook, J. Michael Ellenburg, Brian R. Foster, Charles F. Harper, R. Rick Hart, Christopher B. Maddox, Ronald F. Miller, J. Edward Norris, James J. Penland, Stephen L. Price, Bobby Shepard, Hunter Simmons, and R. Ronald Swanner. (Outside Directors' Mot. to Dismiss [3] at 1.)

[4] In addition to serving on the Board of Directors for the Holding Company and the Bank, Defendant Tom A. Bryan was also the President and Chief Executive Officer of the Bank. (Compl. [1], Exh.

Following the parties' briefing on the above motions,[5] the FDIC-R filed the present Motion to Intervene.  The FDIC-R contends that it has a right to intervene in this case because the plaintiffs have asserted derivative claims of bank mismanagement by the Director Defendants in their roles as Bank officers and because these claims now belong to the FDIC-R.[6]  In addition, the FDIC-R asserts that it owns the two liability insurance policies for the directors and officers from which the plaintiffs hope to recover.[7]  Alternatively, the FDIC-R requests permission to intervene under the Court's discretionary power.  Both the plaintiffs and the Outside Director Defendants oppose intervention on grounds that the FDIC-R has no legally protectable interest in the case and intervention would needlessly delay the proceedings.

_____

A at ¶ 27.)

[5]  The Court has denied without prejudice [45] the defendants' Motions to Dismiss [3, 8], pending resolution of the FDIC's Motion to Intervene.

[6]  The FDIC-R makes no argument with respect to the plaintiffs' claims against the Accountants in Count Five.

[7]  The two policies are the Chubb and Westchester policies.  The Court notes that the Chubb policy excludes coverage for breaches of fiduciary duties under ERISA.

8

## DISCUSSION

**I.   INTERVENTION AS OF RIGHT**

A party has a right to intervene pursuant to Federal Rule of Civil Procedure 24(a)(2) if: (1) the application to intervene is timely; (2) the party has an interest relating to the property or transaction which is the subject of the action; (3) the party's ability to protect that interest will be impeded by disposition of the action; and (4) the party's interest is not adequately represented by the existing parties in the suit. *Fox v. Tyson Foods, Inc.*, 519 F.3d 1298, 1302-03 (11th Cir. 2008) (quoting *Chiles v. Thornburgh*, 865 F.2d 1197, 1213 (11th Cir. 1989)); *Sierra Club, Inc. v. Leavitt*, 488 F.3d 904, 910 (11th Cir. 2007).

**A.   Timeliness of the Motion to Intervene**

Whether a motion to intervene was timely filed depends upon several factors: "(1) the length of time during which the proposed intervenor knew or reasonably should have known of the interest in the case before moving to intervene; (2) the extent of prejudice to the existing parties as a result of the proposed intervenor's failure to move for intervention as soon as it knew or reasonably should have known of its interest; (3) the extent of prejudice to the proposed intervenor if the motion is denied; and (4) the existence of unusual circumstances militating either for or against a determination that

9

[the] motion was timely." *Georgia v. U.S. Army Corps of Eng'rs*, 302 F.3d 1242, 1259 (11th Cir. 2002) (citing *Chiles*, 865 F.2d at 1213).

Plaintiffs argue that the FDIC-R's motion is untimely because the FDIC-R has been investigating the Bank's failure since May 2009 and because a federal investigative report detailing the Director Defendants' malfeasance at the Bank was issued in January 2010. (Pls.' Br. in Opp. to the FDIC-R's Mot. to Intervene ("Pls.' Br.") [43] at 4.)   The Outside Director Defendants also note that in January 2010 they served the FDIC's former counsel with their motion, filed in the Holding Company's bankruptcy proceeding, seeking payment of defense funds from the insurance policies as a result of threatened claims.  (The Outside Directors' Br. in Opp. to the FDIC-R's Mot. to Intervene ("Outside Directors' Br.") [37] at 4 n.2.)  None of these factors are determinative, however, because the plaintiffs had not yet filed suit when these events occurred, so the FDIC-R could not have known that it had an interest in this specific case.  *See U.S. Army Corps of Eng'rs*, 302 F.3d at 1259.

Considering the relevant factors, the Court concludes that the FDIC-R's motion is timely.  The case was filed in state court on April 30, 2010, and removed to federal court on June 9, 2010.  The FDIC-R's motion to intervene was filed six and a half months later on December 23, 2010.  This time span is within acceptable limits. *See id.* (six-month delay not untimely even though discovery largely

10

completed); *Chiles*, 865 F.2d at 1213 (seven-month delay acceptable). The existing parties have not demonstrated that they will be prejudiced by the FDIC-R's intervention, given that discovery is at the beginning stages and the Court has yet to rule on the defendants' motions to dismiss. *See Chiles*, 865 F.2d at 1213 (no prejudice where motion to intervene filed before discovery had begun and motion to dismiss had been decided.) In contrast, the FDIC-R could suffer prejudice if its intervention motion is denied because, as discussed next, it has a legally protectable interest in the case. Accordingly, the Court finds that the FDIC-R's motion to intervene is timely.

**B.   The FDIC-R's Interest in the Case**

The second requirement of Rule 24(a)(2) is that the proposed intervenor has a "direct, substantial, and legally protectable" interest in the proceeding. *Mt. Hawley Ins. Co. v. Sandy Lake Properties, Inc.*, 425 F.3d 1308, 1311 (11th Cir. 2005) (quotation marks and citation omitted). This means that the proposed intervenor must have an interest that the "law recognizes as belonging to or being owned by the applicant." *Id.* (quotation marks and citation omitted). Moreover, the interest must relate "to the property or transaction which is the subject of the action." *In re Bayshore Ford Trucks Sales, Inc.*, 471 F.3d 1233, 1246 (11th Cir. 2006) (emphasis omitted). The legal nature of that interest,

11

though, need not be identical to the claims raised in the action. *U.S. Army Corps of Eng'rs*, 302 F.3d at 1251; *Chiles*, 865 F.2d at 1214.  Nor must the proposed intervenor demonstrate standing so long as the existing parties have a justiciable case and controversy. *Chiles*, 865 F.2d at 1213.  "Our inquiry on this issue is a flexible one, which focuses on the particular facts and circumstances surrounding each motion for intervention."  *Id.* at 1214 (quotation marks, brackets, and citations omitted).

The FDIC-R satisfies the interest requirement in this case because it has a valid, legally protectable interest in derivative claims against the Bank's officers for their alleged mismanagement of the Bank.  *See Lubin v. Skow*, 382 Fed. Appx. 866, 870 (11th Cir. 2010).  Pursuant to the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), the receiver of a failed bank succeeds to "all rights, titles, powers, and privileges of the insured depository institution, and of any stockholder, member, accountholder, depositor, officer, or director of such institution with respect to the institution and the assets of the institution." 12 U.S.C. § 1821(d)(2)(A)(i) (2006).  Moreover, FIRREA authorizes the FDIC-R to sue a bank's former officers and directors for actions for which they may be held personally liable, including gross negligence, breach of fiduciary duty, and simple negligence.  *Id.* at § 1821(k); *Atherton v. FDIC*, 519 U.S. 213, 227-29 (1997) (concluding

12

that FIRREA's gross negligence standard "provides only a floor" and that the FDIC may also sue directors and officers for state law claims such as simple negligence).

The Eleventh Circuit held in *Lubin* that "FIRREA grants the FDIC ownership over all shareholder derivative claims against the Bank's officers."[8] *Lubin*, 382 Fed. Appx. at 870.  These include claims that a bank's officers breached their fiduciary duties to the bank by mismanaging it, thereby causing economic harm to the bank and its holding company.  *See id.* at 870-871 (finding claim that bank's officers impaired the bank's capital and wasted its assets so as to cause the holding company's bankruptcy was "a classic derivative harm" because any wrong done by the bank's officers was done to the bank).  In such a case, "only the FDIC can sue Bank officers for this alleged breach of fiduciary duty to the Bank." *Id.* at 871.

Although the plaintiffs are not Bank shareholders, their complaint is replete with the precise type of Bank mismanagement claims that now belong to the FDIC-R.  (Compl. [1], Exh. A at ¶¶ 77-205.)  For example, the complaint alleges the Director Defendants' jeopardized the Bank through expensive corporate jet purchases, speculative commercial real estate loans, fraudulent loan buy-back

---

[8] Although *Lubin* is an unpublished opinion, and therefore not binding precedent, all parties cite *Lubin* as the relevant authority.

schemes, and violations of directives issued by the United States Office of the Comptroller of the Currency ("OCC"). (*Id.* at ¶¶ 90, 126.) These and other similar allegations concerning the Director Defendants' breaches of fiduciary duties to the Bank may well be determined to be derivative claims which belong to the FDIC-R under FIRREA. *See Lubin*, 382 Fed. Appx. at 870.

Moreover, while the plaintiffs assert causes of action for breaches of fiduciary duties under the Deferred Plan and Incentive Plan, the foundation for these causes of action is their claim that the Director Defendants mismanaged the Bank. As the complaint explains,

> Each Director Defendant knew that participants in the DCP and LTIP were relying on each of them to conduct proper oversight of SFSI, Silverton [Bank] and Executive Management to ensure the solvency of the Plans. Plaintiffs' investments in the DCP and LTIP were entrusted, literally and figuratively, to the care of the Director Defendants. ***The Director Defendants violated this trust by repeatedly failing to conform the bank's financial practices to Generally Accepted Accounting Principles ("GAAP"), by violating multiple duties of trust and prudence, and by repeatedly flouting regulatory directives from the OCC.*** At a point prior to the bank's demise, the OCC flat-out accused the Director Defendants of violating its directives and established banking law. The Director Defendants' failures to properly and prudently perform their solemn duties of trust, such as by flagrantly failing to obey the OCC, led directly to Silverton's failure and bankruptcy. Silverton's failure caused millions of dollars of losses to DCP and LTIP participants such as Plaintiffs.

(Compl. [1], Exh. A at ¶ 123 (emphasis in original).)

AO 72A
(Rev.8/82)

In order to resolve the issue of whether the Director Defendants breached their fiduciary duties under the plans, as alleged in the complaint, a factfinder must first determine whether the Director Defendants breached their fiduciary duties to the Bank. Accordingly, the FDIC-R has a direct, substantial, and legally protectable interest in the lawsuit challenging the Director Defendants' management of the Bank and the plans. *See Chiles*, 865 F.2d at 1214 (concluding that detainees had a valid interest in a lawsuit challenging a federal facility's operation because the detainees were being held at the facility, "the axis on which the lawsuit turns", and because they were asserting legal rights of their own).

The plaintiffs and the Outside Directors argue that FIRREA does not apply because the plaintiffs' claims only relate to the Holding Company. Specifically, they argue that the plaintiffs' claims arise solely because they were creditors of the Holding Company, not the Bank, and that they are only suing the Holding Company's Board of Directors for the latter's breaches of fiduciary duties under the Deferred Plan and Incentive Plan. The plaintiffs and the Outside Directors contend that another judge on this court denied intervention to the FDIC-R for the same reason, in *Patel, et al. v. Patel, et al.*, No. 1:09-CV-3684-CAP (N.D. Ga. Dec. 29, 2010) (Order denying motion for intervention) [37-1].

15

The plaintiffs and the Outside Directors are correct that FIRREA does not apply to claims against the officers of a holding company for wrongs they did to the holding company. *See Lubin*, 382 Fed. Appx. at 872 n.9 ("Under FIRREA, the FDIC succeeds to the rights of the Bank only. Therefore, where the Trustee is suing to vindicate the rights of the Holding Company against its own officers, FIRREA is not invoked.") This principle was applied in *Patel*, wherein shareholders of a holding company sued the holding company directors (who also served as the bank's directors) for federal and state securities law claims and state common law claims, arising out of the plaintiffs' purchase of holding company stock through private placement memoranda drafted and approved by the defendants. *Patel*, slip op. at 1-3, 5-6. The *Patel* court found that the FDIC did not own these claims because the plaintiffs were suing the holding company officers for direct claims arising from their status as holding company shareholders. *Id.* at 6-7.

*Patel* is distinguishable because the plaintiffs here are not merely holding company creditors, nor are they suing only the holding company officers. Rather, the plaintiffs are Bank employees who participated in compensation plans that the complaint acknowledges were provided by both the Holding Company and the Bank. (Compl. [1], Exh. A at ¶ 5.) Under the terms of the plans, and as repeatedly emphasized in the complaint, plaintiffs are general

16

creditors of the Bank, as well as the Holding Company. (*Id.* at ¶¶ 22, 25, 57, 252, 276; DCP Trust [43-4] at § 1(d); LTIP [43-5] at § 5.6.)  While the complaint states that the action is brought against the Holding Company's Board of Directors as the fiduciaries of the Deferred Plan and Incentive Plan, the complaint's caption names the Director Defendants in their roles as Bank officers and/or the Holding Company officers. (Compl. [1], Exh. A at 1 and ¶ 4.)  The complaint contends that the Boards of Directors for the Holding Company and the Bank "acted interchangeably and without formal distinction" because the same people served on both boards.[9]  (*Id.* at ¶ 22.)  Moreover, the complaint alleges that both plans were "created, overseen and controlled by the affirmative actions of the Director Defendants of SFSI and Silverton Bank." (*Id.* at ¶¶ 22-23.)  Thus, unlike *Patel*, the plaintiffs' allegations are not confined only to the holding company.

The plaintiffs also dispute the FDIC's characterization of their causes of action as derivative claims.  Plaintiffs assert that their ERISA claims in Counts One through Three are, by definition,

---

[9] The plaintiffs' lack of distinction between the two Boards of Directors is evidenced by the complaint's collective reference to the Holding Company and the Bank as "Silverton Bank" or simply the "bank." (Compl. [1], Exh. A at ¶ 4.)  For example, rather than listing each Director Defendant's position only on the Holding Company's Board of Directors, the complaint states that each Director Defendant "served on the bank's Board of Directors." (*Id.* at ¶¶ 27-42.)

AO 72A
(Rev.8/82)

direct claims because they are the plan participants under the Deferred Plan, and the Bank could not prosecute such claims. (Pls.' Br. [43] at 10.) Plaintiffs likewise indicate their Georgia common law claim in Count Four is direct because their claim relates solely to their vested Incentive Plan interests. (*Id.* at 9-10.) The FDIC-R responds that all four causes of action are premised upon conduct that injured the Bank (i.e., the Director Defendants' mismanagement of the Bank). Because the plaintiffs' losses are incidental to, and flow from the Bank's injury, the FDIC-R contends that these claims are derivative and are now owned by the FDIC-R. (FDIC-R's Br. in Reply to the Pls.' Br. [44] at 8-9.)

The Court need not resolve this dispute at this juncture. The issue before the Court is whether the FDIC-R has a right to intervene based on a legally protectable interest in the case. *See Chiles*, 865 F.2d at 1212 ("The focus therefore of a Rule 24 inquiry is whether the intervenor has a legally protectable interest in the litigation."). There is no requirement that the FDIC-R own all of the plaintiffs' causes of action, or even that its claims be identical. *See* FED. R. CIV. P. 24(a)(2); *Chiles*, 865 F.2d 1197 (explaining that the proposed intervenor's interest need not "'be of a legal nature identical to that of the claims asserted in the main action'"). At this stage, it is sufficient that the FDIC-R has a legally protectable interest in the proceeding, which it does

18

because the FDIC-R has the right to assert derivative claims against the Director Defendants for mismanaging the Bank, and such claims are an integral part of the plaintiffs' causes of action as pled in their complaint. Whether the complaint alleges solely derivative harm, such that FIRREA precludes the plaintiffs from any recovery, is a matter which the FDIC-R, as an intervening plaintiff, can litigate as these proceedings move forward. *See Lubin*, 382 Fed. Appx. at 870-72 (after the FDIC's intervention in the case, the district court granted the FDIC's motion to dismiss claims against the bank's officers "[b]ecause the Complaint alleges derivative harm, recovery from which is preempted by FIRREA").

Accordingly, the Court finds that the FDIC-R meets the second requirement for intervention as of right.

### C. Impairment of the Intervenor's Interest

The third requirement under Rule 24(a)(2) is that the disposition of the action will impede or impair the proposed intervenor's ability to protect its interest. *Fox*, 519 F.3d at 1303. The FDIC-R contends that intervention is required to protect its ability to oversee the direction of any litigation against the Director Defendants for claims of Bank mismanagement, to protect the FDIC-R's right to control, prosecute or dismiss its own claims, and to protect the FDIC-R's ability to fulfill one of its primary duties as Receiver. The Court agrees. If intervention is denied, the

19

claims of Bank mismanagement in this case will be decided without the FDIC-R's input, thereby usurping the FDIC-R's authority to pursue these claims as it sees fit. *See* 12 U.S.C. § 1821(k); *Atherton*, 519 U.S. at 227-29; *Lubin*, 382 Fed. Appx. at 870. Accordingly, the FDIC-R has satisfied the third requirement as well.

**D.  Adequate Protection of the Intervenor's Interest**

The fourth and final requirement for intervention is that the proposed intervenor's interest will not be adequately represented by the existing parties in the suit. *Fox*, 519 F.3d at 1303. The FDIC-R has a "'minimal'" burden to show "that representation of [its] interest 'may be' inadequate.'" *Chiles*, 865 F.2d at 1214 (quoting *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972)). Unless the existing parties will provide adequate representation, intervention should be allowed. *Id.*

Here, neither party can adequately represent the FDIC-R's interest. As the FDIC-R points out in its brief, the plaintiffs represent only one set of Bank creditors seeking recovery, whereas the FDIC-R must seek a fair recovery for all creditors. In any event, it is the FDIC-R that is authorized to bring derivative claims of Bank mismanagement against the Bank officers, not the plaintiffs. *See Lubin*, 382 Fed. Appx. at 370. The FDIC-R has, in fact, recently filed a lawsuit asserting similar claims of Bank mismanagement against many of the same Director Defendants. *FDIC-R*

20

*v. Tom Bryan, et al.*, No. 1:11-cv-02790-JEC (N.D. Ga. Aug. 22, 2011). The Director Defendants, as adverse parties in the FDIC-R's separate lawsuit, clearly have conflicting interests with the FDIC-R. Accordingly, neither the plaintiffs nor defendants would be adequate representatives of the FDIC-R.

Having satisfied the four requirements of Rule 24(a)(2), the FDIC-R is entitled to intervene as an additional plaintiff in this case. *See Sierra Club, Inc.*, 488 F.3d at 910 (instructing that intervention under Rule 24(a)(2) "must be granted" when the four requirements are met).

<u>CONCLUSION</u>

Accordingly, the Court **GRANTS** the FDIC-R's Motion to Intervene [30]. Given that the FDIC-R has since filed a Complaint in Intervention [50-1], the Court **DENIES AS MOOT** its request to stay proceedings and extend time to file a pleading in intervention [50-2 and 50-3].

SO ORDERED, this <u>16th</u> day of September, 2011.

<u>/s/ Julie E. Carnes</u>
JULIE E. CARNES
CHIEF UNITED STATES DISTRICT JUDGE

21